UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SAMANTHA MOOREHEAD,

        Plaintiff,

    v.

KRG MS OAK BROOK, LLC D/B/A
MCCORMICK AND SCHMICK'S,

        Defendant.

No. 23 CV 403

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Samantha Moorehead was a female employee of defendant KRG MS Oak Brook, LLC. Moorehead worked as a restaurant server, assigned to tables that were less lucrative than banquets or large parties. Worse still, another employee touched and grabbed her. She alleges discrimination on the basis of sex, sexual harassment, and retaliation under Title VII of the Civil Rights Act of 1964. KRG moves for summary judgment. For the reasons discussed below, the motion is granted as to the discrimination and retaliation claims and denied as to the sexual harassment claim.

I. **Legal Standards**

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a dispute of

1

material fact regarding any essential element of her legal claims on which she bears the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II. Facts

### A. Restaurant policies and procedures

Plaintiff Samantha Moorehead worked as a server for defendant KRG at their McCormick and Schmick's restaurant in Oak Brook, Illinois, from September 2019 to October 2023. [35] ¶ 2, 3, 22, 72.[1] Throughout her time at KRG, Moorehead had the same general manager, Fred Jarosh. [35] ¶ 5, 25. Along with Jarosh, KRG employed two assistant managers (the executive chef and a service manager), and hourly "floor" supervisors, who are servers who have received some management training and were selected because they were employees in good standing and passed a background check. [35] ¶ 4, 25. Most of the supervisors and managers employed at the restaurant

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the plaintiff's response to defendant's Local Rule 56.1 statement of facts, [35], and defendant's response to plaintiff's statement of additional facts, [41], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see* [41] ¶ 3, 4. The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions, understanding that the nonmovant is entitled to favorable inferences.

during Moorehead's tenure were male. [41] ¶ 1. The majority of the ten to fifteen servers employed by KRG were male. [35] ¶ 6.

KRG hired Kelly Operations Group to provide Human Resources functions, including a handbook, HR policies, trainings, and other assistance. [35] ¶ 7. The handbook and policies—including an Anti-Harassment and Discrimination Problem Resolution policy—were given to new employees when they were onboarded and were also available online on KRG's payroll website. [35] ¶ 8, 14.[2] The employee handbook defined and prohibited sexual harassment, discrimination, and retaliation. [35] ¶ 9, 10, 11. It provided information for filing complaints with KRG, instructing complainants to report any alleged violation to any person in management or the HR Department. [35] ¶ 12. The handbook provided the contact information for the HR Department. [35] ¶ 13. The Anti-Harassment and Discrimination Problem Resolution policy reiterated the handbook's policies and instructions for reporting. [35] ¶ 15–17. KRG displayed posters in the restaurant with the information for reporting complaints of discrimination or harassment, including a phone number and email to contact HR. [35] ¶ 18.

When she began working for KRG, Moorehead had ten days of training, including completing online courses, filling out paperwork, and training on the job with another server. [35] ¶ 23. Moorehead digitally signed an acknowledgment that

---

[2] Moorehead disputes that she received the handbook, but her record citation to her deposition does not controvert this fact; Moorehead testified that she did not recall whether she received the handbook during onboarding. [35] ¶ 14; [33-2] at 129 (65:8-15).

3

she received the Anti-Harassment and Discrimination Problem Resolution policy during training. [35] ¶ 24.

As part of her job as a server, Moorehead was expected to wait on tables, including taking orders and bringing food out to customers. [35] ¶ 28. She was also expected to assist clearing off tables; restock coolers, shelves, glasses, and bread and butter trays; polish and roll silverware; polish glassware; and wipe down surfaces. [35] ¶ 28.

The server schedule was typically set by Jarosh, though sometimes assistant managers or floor supervisors set it at his request. [35] ¶ 29. These schedules were set based on each server's availability, and KRG accommodated servers' requests for days they were not available to work. [35] ¶ 29–30. The preferred shift was usually a weekend shift. [35] ¶ 29. If the restaurant did not look like it would be busy, managers would call a server ahead of her shift and ask her if she would like to stay home. [35] ¶ 31. If the server still wanted to come in, she could. [35] ¶ 31.

Before each shift, the manager would take the floor plan, split the tables into sections with an equal number of tables, and assign each server a section of tables. [35] ¶ 33. Section assignments rotated from shift to shift, so servers were not assigned the same section each time they came in. [35] ¶ 33. When large parties were scheduled, priority to take those parties went to servers who worked lunch shifts and could handle a large party. [35] ¶ 34. If there were enough large parties, Jarosh would try to place one in each section of a server who could handle large parties. [35] ¶ 34. If the restaurant was having a slow day, Jarosh picked names out of a hat to

4

determine who would be assigned a large party. [35] ¶ 34. For those who did not get assigned a party, Jarosh would assign more booths to their section. [35] ¶ 34. Moorehead believes that only four people, all men, were assigned large parties. [35] ¶ 34.

Sometimes, banquets were held at the restaurant. [35] ¶ 35. These assignments were more pressure-filled than normal shifts and required a higher level of service but were coveted because they have a food and beverage minimum, so servers were guaranteed to make a certain amount of money. [35] ¶ 35; [33-2] at 341 (43:1–4). If banquets were big enough, multiple servers were assigned, with one server designated as the "head" server. [35] ¶ 35. Jarosh assigned banquets to floor supervisors and experienced servers who worked the lunch shift, worked frequently, did not receive customer complaints, could handle multiple tables and maintain their composure, and went "above and beyond" with their service." [35] ¶ 38. These servers included five men, and one woman, Ashley Guzman. [35] ¶ 38. Moorehead and another server, Diane Schalk, believed banquets were assigned because of favoritism toward male employees. [35] ¶ 38, [41] ¶ 13. Moorehead and other servers, including male servers, would complain about not receiving banquet assignments. [35] ¶ 39; [33-2] at 156–57 (173:24–174:7, 175:15–176:1).

When Moorehead started at the restaurant, she was unavailable to work on Tuesdays and Thursdays. [35] ¶ 30. About six months after Moorehead started, COVID-19 forced the restaurant to close. [35] ¶ 22. When it reopened, after a period of fluctuating days off, Moorehead's unavailable days changed to Monday, Tuesday,

and Thursday. [35] ¶ 30. Moorehead would call in ahead of her scheduled shifts to ask if the restaurant would be busy and would sometimes request not to come in. [35] ¶ 32.[3]

Jarosh, another server (Ashley Guzman), and a bartender (Lindsey Larson) all testified that Moorehead provided slow service and did not respond well to pressure, becoming irritated and asking for help even though she should have been able to handle the situation. [35] ¶ 40. Jarosh testified that he had issues with the number of times Moorehead would call off from work, ask to leave work early, and complain that she had to come into work. [35] ¶ 40. Jarosh also testified that Moorehead complained about not wanting to take a large party late in her shift and about coming into the restaurant when it was not busy. [35] ¶ 39.[4] None of these issues regarding Moorehead's performance were put into Moorehead's personnel file. [35] ¶ 40; [41] ¶ 3.

Moorehead complained in August 2022 about not being assigned banquets or large tables, and about the sections to which she was assigned. [35] ¶ 39. According to one floor supervisor, Moorehead was not assigned banquets because she was unable to handle the duties of a banquet. [35] ¶ 36. Jarosh also testified that there

---

[3] Moorehead disputes that she asked not to come in, but her record citation does not contradict this fact. During her deposition, Moorehead said there were times she "could have" requested not to come in, but that "most of the time" the manager would ask her if she would like to stay at home. [33-2] at 153 (160:23–161:5).

[4] Moorehead denies that she complained about these things, but points to no record citation specifically contradicting this fact. She instead cites to the fact that there were no disciplinary issues in her personnel file. [35] ¶ 39.

were not enough banquets to assign to all the servers, and that Moorehead made errors when she did work a banquet. [35] ¶ 36.[5]

## B. Harassment Complaints

### 1. Complaint against Rufino Orzuna

In September 2019, Rufino Orzuna, a line cook at the restaurant, waited in the parking lot and pulled up to Moorehead when she was leaving and asked her to go out for a drink. [35] ¶ 41; [41] ¶ 5. Moorehead declined and Orzuna left. [35] ¶ 41. Moorehead did not report this incident at the time, but later reported it to Jarosh. [35] ¶ 41.[6] About a year later, Orzuna messaged Moorehead on Facebook asking her to hang out. [35] ¶ 42. Moorehead ignored the message and did not report it. [35] ¶ 42. After that, Orzuna rubbed his hand across Moorehead's lower back as she was walking into the restaurant's kitchen. [35] ¶ 43. Moorehead told Orzuna to stop, and that evening or a few days later, Moorehead reported the incident to Jarosh. [35] ¶ 43; [41] ¶ 6.[7] Moorehead told Jarosh about Orzuna touching her and about the prior two incidents. [35] ¶ 44. Jarosh asked Moorehead if she wanted him to contact HR, and

---

[5] Once again, Moorehead denies that she made errors when working a banquet by referring to the fact that she had no disciplinary issues in her personnel file. [35] ¶ 37.

[6] Moorehead denies that she did not report the harassment, but the fact asserted was that Moorehead did not report the incident *at the time*, which is true. As KRG later asserts, and Moorehead admits, Moorehead did tell Jarosh about this incident later, after she complained of another incident with Orzuna. [35] ¶ 44. In her deposition, Moorehead testified that she did not tell anyone when Orzuna first asked her out but did report him when he began touching her on her lower back and buttocks. [33-2] at 135 (86:7–89:12).

[7] KRG claims Moorehead did not complain about Orzuna's conduct until October 2021, citing Moorehead's supplemental answers to KRG's interrogatories. However, in Moorehead's initial answer to the interrogatories, which she incorporates into her supplemental answers, she states she made a verbal complaint to Jarosh around November 2019. [33-2] at 603–04. Additionally, during his deposition, Jarosh detailed the complaint Moorehead made, and did not dispute it occurred as early as 2019. [33-2] at 336 (23:11–26:19).

Moorehead said no, that she would rather have Jarosh talk to Orzuna directly. [35] ¶ 44. Jarosh said he would ask the executive chef to talk to the kitchen staff. [35] ¶ 44. Jarosh also told Moorehead she needed to stop hugging the line cooks and anyone else in the restaurant; Moorehead felt this shifted the blame to her for Orzuna's actions. [35] ¶ 44; [41] ¶ 8. Jarosh told Moorehead that if Orzuna engaged in any more inappropriate conduct, she should let Jarosh know and he would contact HR. [35] ¶ 44. Jarosh did not report Orzuna to HR. [41] ¶ 7. The executive chef, after meeting with Jarosh, instructed kitchen staff that management did not want any wait staff going behind the kitchen line and that physical contact in the restaurant, including hugs, was not acceptable. [35] ¶ 44. After Moorehead's complaint, her hours were not reduced, and she was still assigned large parties and banquets. [35] ¶ 46.

### 2. *Complaint against Ishmael Ramos*

In November 2019, Ishmael Ramos, another KRG employee, asked Moorehead sexual questions when they were alone in the restaurant's personal dining room, including whether she shaved her legs or "down there." [35] ¶ 48–49; [41] ¶ 5. Ramos also grabbed Moorehead's hair from behind. [35] ¶ 48. Moorehead did not tell anyone this happened. [35] ¶ 49. A few months later, Ramos came into the personal dining room, pulled Moorehead's hair, and asked her if she had his tip money. [35] ¶ 50. Matthew Young, another server and Moorehead's boyfriend at the time, walked into the room and saw Ramos holding Moorehead's hair. [35] ¶ 50. Moorehead again did not report this incident, preferring to speak with Ramos directly about it the next

time she saw him. [35] ¶ 51. Moorehead told Ramos not to touch her or make sexual comments because she was in a relationship. [35] ¶ 51.

Another time, while Moorehead was in the kitchen at the restaurant reaching for a ramekin of ketchup, Ramos said he had to grab something and reached over Moorehead, rubbing his forearm against her breasts. [35] ¶ 52. At the time, Moorehead thought it was an accident and did not report it to management. [35] ¶ 52. Soon after that, Ramos came up behind Moorehead as she was walking out of the kitchen and patted Moorehead's right buttock. [35] ¶ 53. Moorehead told fellow server Schalk but did not inform management or confront Ramos. [35] ¶ 53. On February 9, 2022, while Moorehead was in the kitchen wrapping food, Ramos came up behind her, put his arms underneath Moorehead's arms, and squeezed both of Moorehead's breasts with his hands. [35] ¶ 54. Moorehead pushed Ramos off her and told Schalk what happened but did not report the incident to a manager that day. [35] ¶ 54. Moorehead confronted Ramos, telling him not to touch her or make comments toward her. [35] ¶ 54. Ramos apologized. [35] ¶ 54.

On February 11, 2022, Moorehead spoke with another server, Ashley Guzman, about Ramos's conduct. [35] ¶ 55. Guzman revealed that Ramos had also been harassing her, but she had not reported any of it. [35] ¶ 55.

Eleven days later, Moorehead and Young went to Jarosh's office to report Ramos's conduct. [35] ¶ 56. Moorehead told Jarosh that Ramos had been making inappropriate comments to her and Guzman. [35] ¶ 56. Jarosh asked why Moorehead did not report this conduct immediately. [35] ¶ 56. Moorehead said it was because

things had only gotten out of hand recently, and because she found out that it also happened to Guzman. [35] ¶ 56.[8] Moorehead testified that she told Jarosh that Ramos had come up behind her and grabbed her. [35] ¶ 56; *see also* fn. 9 below.

After Moorehead left Jarosh's office, Jarosh immediately called his district manager, who instructed Jarosh to call HR. [35] ¶ 57. Jarosh contacted HR that same evening and told the HR manager that Ramos asked Moorehead out and was making comments about her body that made her uncomfortable. [35] ¶ 57. The HR manager told Jarosh to begin the investigation by collecting statements from Moorehead and Guzman. [35] ¶ 58. Jarosh printed off a written statement form and provided it to Moorehead either that day or the next. [35] ¶ 58.

About a week after Jarosh spoke with HR, the HR manager asked about the status of the witness statements. [35] ¶ 59. Jarosh replied that he was still waiting for the statements, but that he would follow up with Moorehead and Guzman about them. [35] ¶ 59. Moorehead returned her written complaint form, dated March 11, 2022, to Jarosh. [35] ¶ 60. Guzman submitted her written complaint to Jarosh on March 16. [35] ¶ 61. Jarosh submitted the complaints to HR on March 16, and HR reviewed them on March 17. [35] ¶ 63. Based on the statements, HR instructed Jarosh to suspend Ramos and collect further statements from Schalk and Ramos. [35]

---

[8] Moorehead testified during her deposition that she did not report Ramos sooner because she felt Jarosh would not address it because he previously shifted the blame to her and took no action against Orzuna. [41] ¶ 8. KRG denies that no action was taken, pointing to Jarosh's conversation with the executive chef and the executive chef's meeting with kitchen staff, facts to which Moorehead admitted in her response to KRG's statement of facts. [35] ¶ 44; [41] ¶ 8.

¶ 63. Jarosh notified Ramos he was suspended that same day.[9] Before Ramos was suspended, Moorehead and Ramos worked together on some shifts. [35] ¶ 66. Moorehead testified that she told Jarosh she did not want to work any more shifts with Ramos, and that despite saying he would try to rearrange the schedule, when she next came in, Ramos was there. [33-2] at 145 (126:6–14). Ramos did not harass Moorehead again during this time. [35] ¶ 66.

Jarosh spoke with Ramos and Ramos admitted he touched Moorehead's breast, claiming it was an accident. [35] ¶ 65. Based on this admission, KRG terminated Ramos on March 22, 2022, effective when he returned from a pre-approved vacation. [35] ¶ 65.

About a week after being fired, Ramos was at the bar of the restaurant having a drink. [35] ¶ 70. Moorehead was working, and asked Jarosh why Ramos was there. [35] ¶ 70. Jarosh told Ramos he had to leave. [35] ¶ 70. Ramos left and did not return. [35] ¶ 70.

Moorehead says that after her complaint about Ramos's harassment, she was told to stay home, was sent home as soon as she walked in the door, was no longer assigned banquets, and received less preferred sections. [41] ¶ 9.[10] She also claimed

---

[9] KRG did not suspend Ramos right away because "the original allegations relayed to KRG was that Ramos was asking Plaintiff out and making comments about Plaintiff's body, which Rapp [HR] did not believe warranted a suspension. However, when Rapp reviewed the statements of Guzman and Plaintiff which set forth that Ramos had physically touched Guzman and Plaintiff, the determination was to suspend Ramos immediately." [35] ¶ 64. But according to Moorehead, she told Jarosh on February 22 that Ramos grabbed her. [35] ¶ 56.

[10] KRG denies that Moorehead was retaliated against in this way. In support, it says that Moorehead herself would call off and wanted to leave work early. It also says servers were not assigned the same sections from shift to shift. [41] ¶ 9. While that may be true, those

11

her hours were reduced, but her paystub records do not show a reduction in hours. [35] ¶ 67–68; [41] ¶ 10; [33-2] ¶ 504–91.[11]

In August 2023, Moorehead took a part-time server job at another restaurant. [35] ¶ 71. To work both jobs, Moorehead reduced the number of days she was available to work for KRG to just Wednesdays and Saturdays. [35] ¶ 71. Plaintiff resigned from KRG in October 2023. [35] ¶ 72.

## III. Analysis

### A. Sex Discrimination

Title VII prohibits employers from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The "legal standard… is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or

---

contentions do not contradict that Moorehead could also have been called off, sent home, and assigned less preferred sections more often she had been before.

Moorehead also claims her food was delayed or sent out in poor quality by the kitchen after she complained about Ramos. KRG denies this, saying Moorehead testified this happened after she complained about Orzuna, not Ramos. [41] ¶ 9. Moorehead's record support for these actions occurring after her Ramos complaint relies on hearsay from Schalk's deposition and cannot be considered. [33-2] at 414 (23:18–24:17). *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) (explaining that evidence considered on summary judgment must be admissible at trial; if evidence is inadmissible hearsay, it cannot be considered). The record shows that any evidence of food being delayed or of poor quality happened after Moorehead's complaint about Orzuna, not Ramos.

[11] While Moorehead is correct that there was a reduction in her hours the week immediately following her complaint, when looking at the records submitted as a whole, there does not appear to be any reduction. In fact, according to her pay stubs, her average and median number of hours worked essentially stayed the same after her complaint: before February 22, 2022, her average hours worked was 31.07 hours per pay period; after February 22, 2022, her average hours worked was 31.12 hours per pay period. [33-2] at 504–91.

other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). There is no difference between "direct" or "indirect" evidence; "[i]nstead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

A person claiming discrimination needs to show "some harm respecting an identifiable term or condition of employment," but that harm does not need to be "significant." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). The adverse action simply needs to bring about some "'disadvantageous' change in an employment term or condition." *Id.* at 354 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Terms or conditions of employment include "hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a [] change in benefits." *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

One way to prove discrimination is under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the plaintiff must make a prima facie case of discrimination. If the plaintiff does so, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). The burden then shifts back to the plaintiff to show evidence that there is a genuine dispute about whether the stated reason was a pretext for discrimination. *Id.*

To make out a prima facie case of discrimination, a plaintiff must show that she, *Jones v. Union Pacific R.R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002):

> (1) is a member of a protected class;
> (2) was meeting her employer's legitimate performance expectations;
> (3) suffered an adverse employment action; and
> (4) was treated less favorably than similarly situated employees who were not in her protected class.

"Regardless of the framework, we ultimately consider all admissible evidence as a whole 'and determine whether a reasonable jury could find that the plaintiff suffered an adverse action because of [her] protected characteristics.'" *Anderson v. Mott Street*, 104 F.4th 646, 652–53 (7th Cir. 2024) (quoting *Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023)).

Here, KRG disputes elements (2), (3), and (4) of the *McDonnell Douglas* framework.

KRG argues that Moorehead did not suffer any adverse employment action. Moorehead responds that she had her hours cut, received less favorable sections and assignments, was not promoted, and was constructively discharged.[12] Drawing inferences in Moorehead's favor, the failure to assign Moorehead to banquets or large parties could be an adverse employment action. KRG does not dispute that Moorehead did not receive banquet or large party assignments, and in fact, admits that certain servers were more likely to get banquet assignments. [35] ¶ 38. Banquets are "coveted" by servers because of the food and beverage minimum, meaning servers

---

[12] KRG does not argue that Moorehead failed to exhaust her administrative remedies for a claim of constructive discharge, or that Moorehead has improperly amended her complaint by adding constructive discharge as an adverse employment action.

are guaranteed a certain amount of money when they are assigned to one. [35] ¶ 35; [33-2] at 341 (43:1–4). Moorehead calls the banquets and large parties "lucrative." [41] ¶ 9. A reasonable juror could find that routinely not getting assigned to banquets or large parties made Moorehead worse off than if she had been assigned those events—that the failure to give her those assignments was "disadvantageous." *Muldrow*, 601 U.S. at 354–55.

On the other hand, there is no evidence that Moorehead's hours were cut. It is true that Moorehead's hours dropped from the pay period before she reported to the pay period after. But looking at the pay records more broadly, there is no genuine dispute about her hours. Moorehead's hours worked varied from as low as 11.33 hours for one pay period (not including her first week or the week before the restaurant shut down for COVID-19) to 46.96 hours before her complaint, with an average of 31.07 hours worked per pay period. [33-2] at 504–60. After the complaint, her hours varied between 11.38 and 44.23 hours per pay period, averaging 31.12 hours worked. [33-2] at 561–91. The 11.35-hour difference from the pay period before the complaint to the pay period after is not the largest difference in the record; in December 2019 to January 2020, for example, there was a 19.23 hour drop from one pay period to the next. [33-2] at 509–10. No reasonable juror could find her hours were cut.

There is also no genuine issue of material fact on Moorehead's failure to promote claim. To make a prima facie case of a failure to promote, Moorehead must show she applied for and was qualified for the supervisory positions she sought. *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733

15

F.3d 722, 728 (7th Cir. 2013). Moorehead puts forth no evidence that she applied for any supervisory positions. Since she cannot meet an element of a prima facie case for failure to promote, no reasonable jury could find that she failed to get a promotion because of her gender.

Moorehead also cannot establish a genuine dispute of material fact that she was constructively discharged. "An employer constructively discharges an employee only if it *makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 426 (7th Cir.1989) (emphasis in original) (internal quotation marks and citations omitted). A plaintiff must show working conditions "even more egregious than that required for a hostile work environment claim." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Moorehead claims that the environment became intolerable because her hours were reduced, because she was not given banquet assignments, and because KRG showed favoritism towards its male employees. [34] at 6. Moorehead's hours were not reduced. Moorehead also continued to work for KRG for over a year after she filed her EEOC complaint. [1-1] at 2; [35] ¶ 72; *see Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023) (finding no constructive discharge because after racist incident, plaintiff continued to work for the defendant for two or three years). She voluntarily reduced her hours to just two days a week when she took a part-time job at another restaurant in August 2023. [35] ¶ 71; *see Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (finding no constructive discharge where the plaintiff was "obviously not pleased with his situation," but he

voluntarily left months after filing his EEOC complaint for a comparable job elsewhere). She may not have gotten the assignments she wanted, but getting specific assignments does not make an environment "intolerable." *See id.* (finding employee's complaint's "about transfers, a late overtime payment, his salary, and difficulties with managers" were "normal workplace friction," not harassment). No reasonable jury could find that Moorehead was constructively discharged from KRG.

Because a reasonable jury could find that not getting banquet assignments was disadvantageous to Moorehead, Moorehead has presented evidence that she suffered an adverse employment action.

But Moorehead's prima facie case fails where she has failed to put forward any comparators to determine whether she was treated less favorably than her similarly situated male colleagues. She has not provided any information to allow a factfinder to determine whether the general "male employees" she references are similarly situated. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) ("Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue."). In *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019), the plaintiff failed to make a prima facie case of discrimination where he did not submit comparators' names, work history, performance reviews, or anything to allow for a "meaningful comparison" of plaintiff to his comparators. Moorehead has similarly not put forth any names, work history, or performance reviews of her comparators. The only

information Moorehead has given is that the colleagues who get banquet and large party assignments are male. This is not enough for a factfinder to find that the comparators are similarly situated. Moorehead has not raised an issue of fact and cannot make a prima facie case for discrimination.

Even if Moorehead could make out a prima facie case, she "cannot rebut [KRG's] legitimate reason" for not assigning her banquets or large parties. *Anderson*, 104 F.4th at 653. Moorehead must show, by a preponderance of the evidence, that KRG's stated reasons denying her banquets and large parties were false, not just baseless or unfair. *Id.*

KRG identified a legitimate, nondiscriminatory reason for not assigning Moorehead banquets or large parties. Three KRG employees testified that Moorehead provided slow service, did not respond well to pressure, and would become irritated and request assistance where she should not have needed help. [35] ¶ 40. Jarosh also testified that he had problems with Moorehead calling off work, saying she wanted to leave work early, and complaining she would have to come into work when the restaurant was not busy. [35] ¶ 40.

While Moorehead denies these claims, her only record support is that none of these issues were written in her personnel file. [35] ¶ 40. Not having any write-ups in a personnel file does not suggest there was a discriminatory purpose. *See Anderson*, 104 F.4th at 653–54 (Plaintiff's belief she was performing satisfactorily, supported only by her lack of write-ups, "does not create a material issue of fact for a jury to consider."); *see also Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir.

2019) (finding that the failure to document behavioral problems does not support a discriminatory purpose); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) ("[N]o reasonable jury could conclude that the firm's failure to follow progressive discipline procedures suggested discrimination."). Here, too, Moorehead's only support for finding KRG's reasoning was a pretext was the lack of write-ups in her personnel file. KRG's company handbook does not require progressive discipline. [33-2] at 302; *Anderson*, 104 F.4th at 653–54. The discipline policy is described as a "general guideline" and says what "may happen if you violate Company policy." [33-2] at 302. There is no evidence presented that KRG strictly followed these guidelines. *Fane*, 480 F.3d at 541. Moorehead's employment was at-will; KRG reserved the right to fire her at any time. [33-2] at 282; *Fane*, 480 F.3d at 541. Moorehead identified no facts giving rise to a reasonable inference that the stated reasons for her not getting banquets were false and a pretext for discrimination.

Though Moorehead cannot make a prima facie case of discrimination, I also take a step back to consider whether, under the evidence as a whole, a reasonable jury could find that Moorehead was discriminated against because of her sex. *Ortiz*, 834 F.3d at 765. Although I find there is a genuine dispute over whether the lack of banquet and large party assignments could be considered an adverse employment action, there is no evidence from which a jury could conclude that the adverse action was taken because of her sex.

KRG has put forth evidence that Moorehead was not given these assignments because she provided slow service, did not respond well to pressure, and would

19

become irritated and request assistance where she should not have needed help. [35] ¶ 40. There were also relatively few banquets, and not every server could be assigned one. [35] ¶ 36. Jarosh had issues with the number of times Moorehead called off work, wanted to leave work early, and complained she would have to come into work. [35] ¶ 40. Contrary to what Moorehead asserts, the absence of a written record of complaints is not evidence of discriminatory purpose. *Graham*, 930 F.3d at 929. She puts forth no other evidence from which a jury could conclude that her sex was the reason she did not get assigned banquets or large parties. There is nothing that ties the only viable adverse action here to a protected characteristic, and KRG is entitled to judgment as a matter of law on Moorehead's discrimination claim.

### B. Sexual Harassment

"An employer violates Title VII when 'discrimination based on sex ... create[s] a hostile or abusive work environment.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). "In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Russell v. Bd. of Trs. of Univ. of Ill.*, 243 F.3d 336, 342–43 (7th Cir. 2001).

Under the test for a hostile work environment based on sexual harassment, the plaintiff must show, *Passananti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012):

> (1) her work environment was both objectively and subjectively offensive;
> (2) the harassment she complained of was based on her sex;
> (3) the conduct was either severe or pervasive; and

20

(4) there was a basis for employer liability.

KRG only disputes that there is a basis to hold it liable, so I assume that sex-based harassment occurred. KRG moves for summary judgment on the ground that it promptly addressed the harassment when it came to light. KRG also argues that Moorehead has failed to exhaust her administrative remedies as to the claims against Orzuna. Moorehead claims there is a genuine issue whether there is a basis for employer liability because Jarosh did not report Orzuna's harassment to HR or take any action against him.[13] She further claims that KRG failed to adequately respond to her complaint about Ramos.

An employer may only be held liable for a coworker harassing another coworker if the employer knew or should have known about the harassment and failed to take prompt action to address the harassment. *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012). The standard is negligence. *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013). An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (internal quotation marks omitted). If, after an employer learns of harassment, it takes steps "reasonably calculated to prevent further harassment," it cannot be held liable. *Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989). The reasonableness of the employer's actions depends

---

[13] Moorehead does not respond to KRG's exhaustion argument.

in part on the severity of the alleged harassment. *McKenzie*, 92 F.3d at 480. While the success of the remedial activity is a factor to consider, the main question is "whether the employer's total response was reasonable under the circumstances as then existed." *Id.*; *Smith v. Sheahan,* 189 F.3d 529, 535 (7th Cir. 1999) ("Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care."). Factors to determine reasonableness include beginning an investigation right away, contacting an EEOC office, confronting the accused with the allegations, interviewing potential witnesses, and changing shifts to reduce or eliminate overlap between the plaintiff and the harasser. *See, e.g.*, *Milligan*, 686 F.3d at 383–85; *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 812–13 (7th Cir. 2001); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535–36 (7th Cir. 1993). "A prompt investigation is the first step toward a reasonable corrective action." *Cole*, 838 F.3d at 898.

Any standalone claim of liability for sexual harassment by Orzuna is not properly before the court. *See Cheek v. W. & S. Life Ins. Co.*, 31 F. 3d 497, 500–01 (7th Cir. 1994) ("[A] Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint," but "the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*." (emphasis in original)). Moorehead did not include Orzuna's conduct in either her EEOC or district court complaint. She cannot bring a

claim of sexual harassment based on Orzuna's conduct. However, evidence of how KRG responded to Moorehead's complaint against Orzuna can be used in evaluating the reasonableness of KRG's response to her complaint against Ramos.

Moorehead did exhaust all administrative remedies for her claim involving Ramos. The question is whether the investigation leading to the termination of Ramos was adequate—whether the steps were "reasonably calculated to prevent further harassment." *Brooms*, 881 F.2d at 421. While the investigation itself began promptly, there were some delays. One possible inference is that the investigation was not tailored to ensure harassment would not happen again. For example, Moorehead turned her written statement into Jarosh on March 11. [35] ¶ 60. Jarosh did not forward the statement to HR that day, and instead waited until March 16, when Guzman also submitted her statement, to email both forms to HR. [35] ¶ 61, 63. Yet, taking the facts as Moorehead presents them, Jarosh knew the allegations were quite serious; Moorehead had told him that Ramos physically groped her. This information did not reach HR until March 16—more than three weeks after Moorehead's verbal report. That the conduct was serious is supported by HR's decision to suspend Ramos immediately upon learning that the harassment included touching. [35] ¶ 64.

Moorehead was forced to continue working with Ramos and there is no evidence that KRG took any steps to talk to Ramos about the accusations or minimize contact between Ramos and Moorehead. In fact, Moorehead testified that Jarosh told her not to tell Ramos—or anyone else—that she had reported Ramos, and a few days

to a week after her report, Ramos still did not know that Moorehead and Guzman had reported him. [33-2] at 142 (117:4–11), 146 (132:2–13).

When a plaintiff's and her harasser's shifts overlap, an employer's response is considered reasonable where there is some attempt to physically separate or reduce contact between the two, or the employer has spoken with the harasser. *See Milligan*, 686 F.3d at 385 (holding that the reassignment to a different floor than harasser's office, reprimand of harasser, and attempt to minimize contact was a reasonable response); *Sutherland*, 632 F.3d at 995 (finding that limiting the overlap and reassigning positions within the store to add physical distance was "reasonably likely to end" harassment); *Berry*, 260 F.3d at 812–13 (finding response reasonable where shifts overlapped, but the investigation began right away and the accused was confronted about the report); *Saxton*, 10 F.3d at 535 n.16 (in finding reasonable response, noting that the plaintiff was allowed to work from home during investigation). Despite beginning an investigation, KRG took no interim steps to ensure the harassment would not continue while that investigation was ongoing.

KRG claims that because there was no further harassment of Moorehead that there is no genuine issue of fact as to employer liability. But Moorehead testified that after Ramos grabbed her breasts, she told him to never touch her again or make comments to her. [35] ¶ 54; [33-2] at 141 (111:4 to 8). She also testified that after she complained to Jarosh and was on shift with Ramos, she ignored Ramos and walked away any time he was in the same room as she was. [33-2] at 142 (115:9–12). This

24

suggests that it was not KRG's response, but rather Moorehead's own actions that prevented further harassment. *See Smith,* 189 F.3d at 535.

While KRG's investigation was prompt, the lack of notice to Ramos, when Moorehead was forced to work with him, left open the possibility that Ramos would continue to harass Moorehead. This is adequate to show a genuine dispute as to the reasonableness of KRG's response. Summary judgment is denied as to Moorehead's harassment claim.

## C.    Retaliation

The antiretaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee who "opposed any practice" that is unlawful under Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). This provision "prevent[s] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). In retaliation cases, like employment discrimination cases, the question is "whether the evidence would permit a reasonable factfinder to conclude" that the retaliatory motive "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021).

A plaintiff makes a prima facie case of retaliation by showing that, *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023):

>        (1) she engaged in a statutorily protected activity;
>        (2) she suffered an adverse employment action; and

       (3) there is a causal link between her protected activity and
           the adverse employment action.

Moorehead claims KRG retaliated against her after she made her complaint about Ramos by reducing her hours and not assigning any banquets to her. Like Moorehead's discrimination claim, KRG contests that Moorehead suffered an adverse employment action. KRG also denies any causal link between Moorehead's complaint and any adverse action.

There is no dispute that Moorehead's hours were not cut. *See* Section III.A., above. However, there is a genuine dispute about whether not getting banquet assignments is an adverse action. *See id.*

Moorehead relies entirely on timing to show a causal connection between her report and the drop in hours and lack of banquet assignments. However, "[s]uspicious timing is rarely enough to create a triable issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). If suspicious timing is the only evidence of causation, plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct." *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001). Typically, only a few days can elapse between the protected activity and the adverse action to draw an inference of causation based on suspicious timing. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). If there is evidence of a retaliatory motive, the burden shifts to the employer to show the adverse action would have occurred even absent her complaints

26

about harassment. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016).

Because not receiving banquets could be an adverse employment action, Moorehead must show that she did not receive those banquets because she reported Ramos. KRG does not dispute that Moorehead did not receive a banquet assignment, but argues, as with the discrimination claim, that she did not receive those assignments because there were not enough banquets for every server to have one and multiple employees testified that Moorehead was unable to handle a banquet. [35] ¶ 36. KRG also notes that Ashley Guzman also reported Ramos at the same time as Moorehead and received banquet assignments after her complaint. [35] ¶ 36.

Moorehead has not put forth any specific banquet after her report that she believes she should have been assigned. Because she is asserting causation based on suspicious timing alone, Moorehead is required to show that the adverse action took place within days of her complaint. *Kidwell*, 679 F.3d at 966. She has not done so. There is no evidence for a jury to conclude that Moorehead did not receive assignments in retaliation for reporting Ramos.

Even if Moorehead did present evidence of a specific banquet she did not receive, however, KRG has shown that she would not have received the banquet even had she not complained. *Lord*, 839 F.3d at 564. Multiple KRG employees testified that Moorehead could not handle banquets, and Jarosh testified that there were simply not enough banquets to go around. It is also noteworthy that another server who came forward to complain about Ramos *did* receive banquet assignments after

she complained, while Moorehead admits that other, male servers also complained about not being assigned banquets. [35] ¶ 36, 39; [33-2] at 156–57 (173:24–174:7, 175:15–176:1). Looking at the evidence as a whole, *Ortiz*, 834 F.3d at 765, there is no basis to connect Moorehead's protected activity to the banquet assignments. KRG is entitled to judgment as a matter of law on Moorehead's retaliation claim.

## IV.    Conclusion

Defendant's motion for summary judgment, [31], is granted in part and denied in part. Summary judgment is granted in defendant's favor as to Moorehead's discrimination and retaliation claims. Summary judgment is denied as to her harassment claim.

ENTER:

Manish S. Shah
United States District Judge

Date: September 30, 2024